UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EA MANAGEMENT, and
WILLIAM ELIAS,

    Plaintiffs/Counter-Defendants,

v.                                                    Case No. 07-11629

JP MORGAN CHASE BANK,                HONORABLE AVERN COHN

    Defendant/Third-Party Plaintiff/
    Counter-Plaintiff.

and

DIRECT LENDING, INC.,
GUSTE SHUKEIREH, and
TINA RIAD SHUKEIREH

    Third-Party Defendants.

_____/

# MEMORANDUM AND ORDER
# GRANTING JP MORGAN'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT
# AND DISMISSING CASE[1]

I. Introduction

This is a banking dispute regarding three cashier's checks. Plaintiffs EA Management and William Elias (collectively Elias[2]) are suing defendant JP Morgan Chase Bank, N.A. (JP Morgan) claiming that JP Morgan wrongfully withheld payment or

---

[1]The Court originally scheduled this matter for hearing. Upon review of the parties' papers, however, the Court finds that oral argument is not necessary. See E.D. Mich. LR 7.1(e)(2).

[2]EA Management is an assumed name of Elias.

dishonored three cashier's checks written out of an account owned by Elias. Elias makes three claims against JP Morgan, as follows:

Count I - Breach of M.C.L. § 440-4402 (wrongful dishonor)

Count II - Breach of Contract

Count III - Negligence

As will be explained, JP Morgan has filed a counterclaim against Elias claiming numerous violations with respect to the account at issue and a third-party complaint against Direct Lending, Inc. (Direct Lending), seeking indemnification. Before the Court is JP Morgan's motion to dismiss or for summary judgment on all of Elias' claims.[3] For the reasons that follow, the motion will be granted.

## II. Factual Background

Direct Lending is a mortgage lender engaged in the sub-prime market. In 2005, Direct Lending hired Elias - the nature of his employment is not clear. Until July 13, 2006, Guste Shukeireh (Shukeireh) was Direct Lending's sole shareholder. On July 13, 2006, Elias acquired 33 1/3% of Direct Lending outstanding stock and Direct Lending issued an appropriate stock certificate to Elias. In late August or early September 2006, Elias agreed to sell back his interest in Direct Lending for $600,000.00. In mid-September 2006, Shukeireh paid Elias $100,000.00 in accordance with a purchase

---

[3]JP Morgan also filed a motion for summary judgment against Direct Lending, essentially seeking a ruling on indemnification in the event JP Morgan is found liable to Elias. The parties agreed to hold briefing in abeyance pending resolution of the instant motion. In light of the Court's decision on JP Morgan's motion against Elias, this motion is MOOT.

The parties also had a phone conference with the Court regarding a discovery matter in which Elias is seeking compliance with subpoenas. Elias recently filed motions to compel regarding the requested discovery. Counsel for Elias stated that the discovery request does not impact the instant motion.

agreement. On September 27, 2006, Shukeireh defaulted on the agreement. On September 27, 2006, Shukeireh and Elias agreed on a schedule of payments of the remaining $500,000.00 due. Under the new schedule of payments, Shukeireh has paid $115,000.00. As of November 19, 2007, Direct Lending still owed Elias $385,000.00 plus interest, costs and attorneys' fees under the payment schedule.

Although the dispute centers on three Cashier's Checks which JP Morgan issued to Elias and later returned, in order to understand the nature of the dispute it is necessary to set forth several transactions involving the parties.

On September 29, 2006, Direct Lending issued Check No. 2253 for $100,000.00 to Elias from Direct Lending's account with JP Morgan. On October 2, 2006, Elias deposited Check No. 2253 into Elias' account at LaSalle bank. However, on October 4, 2006, Check No. 2253 was returned for insufficient funds. As a result, LaSalle Bank charged Elias' account a total of $100,005.00 including $100,000.00 for the returned check, and $5.00 as a "deposit item return fee."

On October 9, 2006, Direct Lending issued Check No. 2275 ("The Replacement Check"), for $100,005.00 to Elias. The Replacement Check was intended to cover the previous $100,000.00 owed to Elias, plus the $5.00 "deposit item return fee" charged Elias by LaSalle Bank.

On October 13, 2006, Elias deposited The Replacement Check in a newly opened JP Morgan account, and executed a Business Signature Card. In the Business Signature Card Agreement, Elias acknowledged JP Morgan's deposit account agreement.

On October 14, 2006, Elias made a withdrawal and obtained an Official Check

3

from JP Morgan for $88,000.00 made payable to EA Management and ultimately deposited in an account at LaSalle Bank. The withdrawal left a balance in Elias' JP Morgan account of $12,005.00.

On October 17, 2006, JP Morgan dishonored The Replacement Check because of insufficient funds in Direct Lending's account. The return of The Replacement Check created an overdraft of $88,006.00.

On October 18, 2006, JP Morgan debited Direct Lending's account and credited Elias' account to eliminate the overdraft and return Elias' account balance to $12,005.00. There was no activity on Elias' account for the month of November.

On December 26, 2006, Elias re-deposited Check No. 2253 (previously return for insufficient funds) into Elias' account. Elias also deposited a Direct Lending starter check No. 99993 for $80,000.00. The starter check was filled out and signed by Elias and was dated July 26, 2006. Elias testified that he wrote the check to himself, as a reimbursement check, while Shukeireh was out of the country. There is no documentation of the purpose for reimbursement.

In addition, on December 26, 2006, Elias attempted to withdraw $190,000.00 from his JP Morgan account, but the bank could not process this request at the time.

On December 27, 2006, Elias again attempted to withdraw $190,000.00 from his JP Morgan account in the form of three Cashier's Checks, at issue here as follows:

| **Check No.** | **Written By** | **Paid To** | **Amount** |
|---|---|---|---|
| 754630669 | William Elias | Mortgage Service Center | $44,088.35 |
| 754630670 | William Elias | Green Tree | $77,162.96 |
| 754630671 | EA Management | William Elias | $70,000.00 |

Shortly after Elias obtained the Cashier's Checks, Shukeireh contacted JP Morgan advising that the Starter Check and Check No. 2253 were procured by fraud. Shukeireh ordered stop payment on both checks. JP Morgan stopped payment on Check No. 2253 and the Starter Check. This resulted in Elias' account being overdrawn by $79,273.31. That amount is explained as follows:

  $12,005.00 - balance as of December 1, 2006

  +$180,000.00 - deposit of Check No. 2253 and Starter Check

  -$191,251.31 - withdrawal on December 27, 2006

  -$27.00 - fees for Cashier's Checks and return of starter check

In January 2007, JP Morgan charged Elias' account an Extended Overdraft Fee of $25.00, increasing its overdrawn status to $79,298.31.

On February 5, 2007, JP Morgan credited Elias' account for $191,251.31 as a return to Elias of the amount withdrawn by Elias via the Cashier's checks. This resulted in a positive balance in Elias' account of $11,953.00. Elias withdrew this amount on February 28, 2008 and closed the account.

### III. Procedural History

On March 6, 2007, Elias sued JP Morgan in Wayne County Circuit Court essentially claiming that JP Morgan should have honored the Cashier's Checks. JP Morgan removed the case to federal court based upon diversity of citizenship—Elias a citizen of Michigan, and JP Morgan is a citizen of Ohio, with the amount in controversy exceeding $75,000.00.

On May 2, 2007, JP Morgan filed a counterclaim against Elias for breach of warranties under M.C.L. §§ 440.3416, 440.3417, 330.4207 and 440.4208. Also on May

2, 2007, JP Morgan filed a third-party complaint against Direct Lending seeking indemnification in the event JP Morgan is held liable to Elias.

On March 6, 2008, the Court granted JP Morgan leave to amend its first third-party complaint against Direct Lending and Guste Shukeireh and Tina Riad Shukeireh. The amended third-party complaint makes the following claims: (1) contractual indemnification/breach of contract; (2) common law indemnification/contribution; (3) unjust enrichment; (4) subrogation; (5) misrepresentation; (6) negligent misrepresentation; (7) innocent misrepresentation; (8) breach of warranty; and (9) negligence.

JP Morgan then filed the instant motion.

### III. Legal Standards

#### A. Motion to Dismiss

In facing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (2007), a complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if the complaint does not plead "enough facts to state a claim to relief that is plausible on its face." Id. at 1974 (rejecting the traditional Rule 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Under Rule 12(b)(6), "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels

6

and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp., 127 S.Ct. at 1964-65 (citations omitted); Association of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007).  Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp., 127 S.Ct. at 1965 (citations omitted).

B.  Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.  Additionally, and

significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

IV. Analysis

Each of Elias' claims against JP Morgan are separately addressed.

A. Count I - Violation of M.C.L. § 440.4402 and § 440.3411

JP Morgan first argues that Elias has failed to state a claim for violation of M.C.L. § 440.4402[4] because that section does not apply to cashier's checks. Elias did

---

[4] Section 440.4402, provides:
> Sec. 4402. (1) Except as otherwise provided in this article, a payor bank wrongfully dishonors an item if it dishonors an item that is properly payable, but a bank may dishonor an item that would create an overdraft unless it has agreed to pay the overdraft.
> (2) A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. Liability is limited to actual damages proved and may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case.
> (3) A payor bank's determination of the customer's account balance on which a decision to dishonor for insufficiency of available funds is based may be made at any time between the time the item is received by the payor bank and the time that the payor bank returns the item or gives notice in lieu of return, and no more than 1 determination need be made. If, at the election of the payor bank, a subsequent balance determination is made for the purpose of reevaluating the bank's decision to dishonor the item, the account balance at that time is determinative of whether a dishonor for insufficiency of available funds is wrongful.

8

not respond to this argument, and therefore conceded that JP Morgan is correct. As such, Count 1 must be dismissed to the extent it claims a violation of section 4-402.

However, anticipating Elias' response, JP Morgan says that the proper code section pertaining to cashier's checks, M.C.L. § 440.3411 (3-411), also does not apply for several reasons. In his response, Elias addresses the applicability of 3-411 and asks to amend the complaint to state a claim for violation of this section. JP Morgan says amendment would be futile because the section does not apply under the circumstances.

Although Count I as it stands does not assert a claim for violation of section 3-411, because the parties have discussed its applicability, the Court will consider whether Elias has stated a claim under this section.

Section 3-411 provides:

> 440.3411. **Refusal to pay cashier's checks**, teller's checks, and certified checks
> Sec. 3411. (1) As used in this section, "obligated bank" means the acceptor of a certified check or the issuer of a cashier's check or teller's check bought from the issuer.
> (2) If the obligated bank wrongfully (i) refuses to pay a cashier's check or certified check, (ii) stops payment of a teller's check, or (iii) refuses to pay a dishonored teller's check, the person asserting the right to enforce the check is entitled to compensation for expenses and loss of interest resulting from the nonpayment and may recover consequential damages if the obligated bank refuses to pay after receiving notice of particular circumstances giving rise to the damages.
> (3) Expenses or consequential damages under subsection (2) are not recoverable if the refusal of the obligated bank to pay occurs because (i) the bank suspends payments, (ii) the obligated bank asserts a claim or defense of the bank that it has reasonable grounds to believe is available against the person entitled to enforce the instrument, (iii) the obligated bank has a reasonable doubt whether the person demanding payment is the person entitled to enforce the instrument, or (iv) payment is prohibited by law.

1. Elias Lacks Standing With Respect to Two Cashier's Checks

JP Morgan first says that Elias lacks standing to bring a claim under section 3-411 with respect to two of the Cashier's Checks - Check No. 754630669 made payable to Green Tree in the amount of $77,162.96 and Check No. 754630670 made payable to Mortgage Service Center in the amount of $44,088.35 - because Elias was not "entitled to enforce" these checks. The Court agrees.

Under section 3-411, a bank's alleged obligation to pay a cashier's check runs only to "a person entitled to enforce" the cashier's check. See M.C.L. § 444.3411 (stating that a bank's obligation to pay a cashier's check "is owed to a person entitled to enforce the instrument."). Under M.C.L. § 440-3301, only the following persons are "persons entitled to enforce" an instrument:

> (1) the holder of the instrument
> (2) a nonholder in possession of the instrument who has rights of a holder; and
> (3) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to M.C.L. § 440.3309 or M.C.L. § 440.3418(d).

M.C.L. § 440.3301(i)-(iii).

JP Morgan is correct that Elias does not fall into any of these categories. First, Elias is not the holder of Cashier's Check Nos. 754630669 or 754630670. A "holder" is defined by M.C.L. § 440.1201(20) as "the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession." Cashier's Check Nos. 754630669 and 754630670 are not payable to bearer, instead, they are payable to identified people –Green Tree and Mortgage Service Center. Cashier's Check Nos. 754630669 and 754630670 were not paid to Elias and Elias is not in possession of the Cashier's Checks. As a result,

10

Elias is not a "person[] entitled to enforce" Cashier's Check Nos. 754630669 and 754630670. See JTM, Inc. v. Totalbank, 795 So. 2d 161 at 162-3 (Fla. App. 2001) (holding that only "the person asserting the right to enforce" the cashier's check standing to sue for dishonor, who is: (1) the holder of the instrument; (2) a nonholder in possession of the instrument who has the rights of a holder; or (3) a person not in possession of the instrument who is entitled to enforce the instrument.)

Elias also does not fall into the two remaining categories of M.C.L. § 440.3301. First, in order to qualify as a "nonholder in possession who has the rights of the holders" of the two Cashier's Checks, Green Tree and Mortgage Service Center were required to transfer the two Cashier's Checks to Elias under M.C.L. § 440.3301, 3203, 3204. Green Tree and Mortgage Service Center did not transfer the two Cashier's Checks to Elias, so Elias is not "a nonholder in possession" of the two Cashier's Checks "who has the rights of the holders."

Finally, Elias is not a "person[] entitled to enforce" the two Cashier's Checks under M.C.L. § 440.3301(ii) because Elias is not attempting to enforce a lost, stolen, or destroyed Cashier's Check (M.C.L. § 440.3309), nor is Elias attempting to enforce a Cashier's Check that has been paid to another by mistake (M.C.L. § 440.3418).

Overall, because Elias is not a "person[] entitled to enforce" Cashier's Checks Nos. 754630669 and 754630670, Elias lacks standing to sue JP Morgan under M.C.L. § 418.3411 for the Cashier's Checks made payable to Green Tree and Mortgage Service Center. Count I is dismissed as to these checks.

2. Elias' Claim Under Section 3-411 Fails

As to the Cashier's Check made payable to EA Management, Elias' claim under section 3-411 fails. Under M.C.L. § 440.3411, a bank may dishonor or stop payment on a Cashier's Check, if: (1) the bank asserts a claim or defense of the bank that it has reasonable grounds to believe is available against the person asserting the right to enforce the instrument, or (2) the bank has a reasonable doubt whether the person demanding payment is the person lawfully entitled to enforce the cashier's check. M.C.L. § 440.3411(3).

Here, the undisputed evidence shows that JP Morgan stopped payment on all three Cashier's Checks because Direct Lending, Guste Shukeireh and Tina Riad Shukeireh, advised JP Morgan that Elias had procured the Cashier's Checks by fraud. A bank may stop payment on its Cashier's Check if it has reasonable grounds to believe the cashier's check was procured by fraud. See, e.g., Hart v North Fork Bank, 37 A.D.3d 414, 415 (N.Y. App. Div. 2007) (bank may stop payment on its cashier's check if "there is evidence of fraud"); In re Johnson, 2005 WL 3506592 at *2 (Bankr. C. D. Ill. 2005) ("a bank may be justified in stopping payment on a cashier's or teller's check in cases of error or fraud").

Here, because JP Morgan had reasonable grounds to believe that the defense of fraud was available to it, and because JP Morgan had reasonable doubt as to whether Elias was lawfully entitled to enforce the Cashier's Checks, JP Morgan cannot be held liable for any of the Cashier's Checks under M.C.L. § 440.3411. Count I is dismissed as to the Cashier's Check payable to Elias.

12

### 3. Elias Received The Amount Sought

In addition, Elias' claim fails because he received the amount sought in the complaint. When JP Morgan stopped payment on the Cashier's Checks and returned Check No. 2253 and the Starter Check, and charged Elias' account for an overdraft fee, Elias' account was overdrawn by $179,298.31. JP Morgan, however, later credited Elias' account, resulting in a positive balance of $11,953.00. Thus, JP Morgan restored Elias' rightful position prior to filing of Elias' suit. Therefore, because Elias already received the amount that he is seeking in this lawsuit, Elias' claims fail as a matter of law.

### 4. Elias' Arguments Lack Merit

Elias' entire argument rests upon the premise that a bank may never refuse to honor a cashier's check. This proposition is contradicted by the current versions of Articles 3 and 4 of the UCC and is simply incorrect.

Notably, Elias relies on prior versions of Articles 3 and 4 and case law before the revisions to these articles in the early 1990's. Articles 3 and 4 of the UCC were significantly revised in the early 1990s, and Michigan's current version of Articles 3 and 4 were enacted on September 30,1993. Furthermore, none of the cases cited by Elias in his Response interpret the current versions of Articles 3 and 4.

The current and revised versions of Articles 3 and 4 make clear that: (1) a bank's liability (or lack thereof) for refusing to honor a cashier's check is governed by section 3-411 of the UCC; (2) only a payee of a cashier's check (or someone who has acquired the rights of a payee) has standing to pursue a claim under section 3-411; and (3) a bank may refuse to honor its cashier's check, even to a payee, in certain circumstances.

13

As discussed above, Elias does not have standing to sue with respect to two of the three Cashier's Checks. Elias has standing only with respect to the third Cashier's Check, payable to EA Management. However, the current revised versions of Articles 3 and 4 of the UCC state that a bank may refuse to honor its cashier's check, even with respect to a payee of such checks, under certain circumstances. Specifically, Section 3-411 makes clear that a bank will only incur liability for "wrongfully" refusing to honor a cashier's check when that check is presented by the person the cashier's check is paid to. M.C.L. § 440.3411.[5] Section 3-411 further makes clear that if a bank does not "wrongfully" refuse to pay its cashier's check, the bank will incur no liability, stating: "If the bank is not obliged to pay, there is no recovery." M.C.L. § 440.3411, Comment 3. Section 4-403 allows a bank to refuse payment on its own checks the same as any other customer. *Miller, Harrell,* "The Law of Modern Payment Systems ¶ 9.01[4][d][ii] (1st Ed. 2002).

Under section 3-411, a bank does not "wrongfully" refuse to honor its cashier's check if: (1) the bank asserts a defense of the bank that it has reasonable grounds to believe is available against the person asserting the right to enforce the instrument, or (2) the bank has a reasonable doubt whether the person demanding payment is the person lawfully entitled to enforce the cashier's check. M.C.L. § 440.3411 (3).

Here, JP Morgan properly refused to honor the Cashier's Checks at issue as

---

[5]The prior version of Section 3-411 did not address whether or not a bank could refuse to honor one of its cashier's checks, and simply stated as follows:
    (1) Certification of a check is acceptance. Where a holder procures certification the drawer and all prior endorsers are discharged.
    (2) Unless otherwise agreed a bank has no obligation to certify a check.
    (3) A bank may certify a check before returning it for lack of proper endorsement. If it does so the drawer is discharged.

14

allowed under the UCC. The undisputed facts demonstrate that JP Morgan had reasonable grounds to stop payment on the Cashier's Checks. JP Morgan had reasonable grounds to believe that Elias was not lawfully entitled to enforce the Cashier's Checks after Direct Lending contacted JP Morgan and stated that Check No. 2253 and the Starter Check, used to fund the transaction, were procured by fraud. Therefore, JP Morgan has established reasonable grounds for their dishonor of all three Cashier's Checks.

In response, Elias admits that he procured Check No. 2253 and the Starter Check through fraud. However, Elias says, because the fraud was against Direct Lending not JP Morgan, he may still bring a claim to enforce the three Cashier's Checks. This argument lacks merit. Elias falsely represented to JP Morgan that he was lawfully entitled to Check No. 2253 and the Starter Check. Elias then used funds obtained through this fraudulent transaction to fund the three Cashier's Checks at issue. When Direct Lending contacted JP Morgan to stop payment on the checks, the burden of covering the funds listed on the three checks fell solely to JP Morgan. Therefore, the transaction was not only an attempt to defraud Direct Lending, but also JP Morgan.

### B. Count II - Breach of Contract Claim - Account Agreement

JP Morgan says that Elias' claim for breach of contract fails. JP Morgan says that Elias has failed to adequately plead the elements of the claim. Moreover, JP Morgan says that the only contract between the parties - the Account Agreement - contains a hold harmless clause for failure or refusal to honor items drawn on Elias' account. JP Morgan argues that they were relieved from any liability under the account agreement once Direct Lending notified them of Elias' fraud.

15

Elias, however, says that JP Morgan was contractually obligated to place a hold on his account, rather than a stop payment on the Cashier's Checks. Elias states that the hold would have left $191,251.31 in his account subject to disposition of this and other legal proceedings.

JP Morgan's position is well-taken. Under Michigan law, "the elements of a breach of contract claim are: (1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury." Webster v. Edward D. Jones & Co., L.P., 197 F.3d 815, 819 (6th Cir. 1999)

Here, Elias simply alleges that it entered into "a contract" with JP Morgan, but fails to identify the contract or set forth any material terms. Elias further alleges that JP Morgan breached the contract by "dishonoring and/or stopping payment on" the Cashier's Checks. This is insufficient to state a claim for breach of contract.

Putting aside Elias' vague allegations, the contract between the parties - the Account Agreement - contains terms, which are fatal to Elias' claim. The Account Agreement specifically provides:

> Upon receipt of oral or written notice from any party of a claim regarding the Account, we may place a hold on your Account and shall be relieved of any and all liability for our failure or refusal to honor any item drawn on your Account or any other withdrawal instruction.

Here, it is undisputed that JP Morgan received notice from Direct Lending of a claim regarding Elias' account. Namely, that Elias had fraudulently and without authorization deposited Check No. 2253 and the Starter Check into his account. At that point, under the Account Agreement, JP Morgan was relieved from liability for failing to

16

honor any withdrawal instruction from Elias, including the instruction to withdraw $191,251.31 via the Cashier's Checks. Thus, Elias has failed to state a claim for breach of contract under Count II, and the terms of the Account Agreement bar any such claim as a matter of law. Count II must be dismissed.

C. Count III - Negligence

Finally, JP Morgan says that Elias cannot make out a negligence claim. JP Morgan says that although Elias alleges that JP Morgan owes a duty to him, he does not identify the duty. JP Morgan says that the only duties it owes to Elias stem from Michigan's version of the UCC and the Account Agreement.

In response, Elias argues that JP Morgan owes a duty to properly handle the Cashier's Checks. Elias argues that given the parties' "depository relationship," This Court should impose a duty on JP Morgan to properly administer the accounts and honor the Cashier's checks. Further, Elias argues that there is nothing in JP Morgan's motion, which shows that a bank does not owe an account holder a duty to properly administer accounts.

The Court agrees with JP Morgan. It is well-established that a prima facie case of negligence requires a plaintiff to prove four elements: a duty, a breach of that duty, causation, and damages. Case v. Consumers Power Co., 463 Mich. 1, 6 (2000). "As a general rule, there must be some active negligence or misfeasance to support a tort. There must be some breach of duty distinct from breach of contract." Rinaldo's Constr Corp v. Michigan Bell Tel Co., 454 Mich. 65, 83 (1997), quoting Hart v. Ludwig, 347 Mich. 559, 563 (1956). "In other words, the threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation."

17

Rinaldo's Const. Corp., supra at 83. Significantly, the sole "breach" alleged by Elias is JP Morgan's failure to honor the Cashier's Checks. JP Morgan's liability for this action is governed by section 3-411. Elias has not alleged a violation of a legal duty separate and distinct from JP Morgan's obligations under section 3-411 which, as stated above, Elias has failed to make out a viable claim. Count III must be dismissed.

## VI. Conclusion

This is a peculiar case. It is a claim to enforce the payment of three Cashier's Checks based solely on the fact that the Cashier's Checks were issued by the bank and therefore the bank was obligated to honor them. It is true that cashier's checks play a unique role in the American economy and are widely recognized as cash equivalent and that difficulty in converting cashier's checks to cash may lower the acceptance of cashier's checks as a reliable instrument. However, the issuance of a cashier's check does not place a burden solely on the issuing bank. When a bank enters into an agreement with a customer to provide a cashier's check the bank agrees to issue the cashier's check only after being provided with sufficient funds as written on the cashier's check. The funds given to the bank to cover the cashier's check are generally in the form of cash and the bank relies upon the cash to fund the cashier's check. When the cash to fund the cashier's check was fraudulently obtained, the customer cannot reasonably expect the bank to honor the transaction. To do so would place an undue burden on the bank. Even after a cashier's check is issued, the statute is clear that when a bank has a reasonable belief that the funds provided were obtained through the fraud of the customer, the bank has the right to stop payment on that cashier's check. The bank cannot be expected pledge its resources to the benefit of customer fraud.

Here, Elias made deposits into his account at JP Morgan with funds he knew he was not entitled to and then seeks to place liability on JP Morgan for not honoring the Cashier's Checks which were drawn upon with the tainted funds. In other words, he comes to Court with unclean hands. Requiring JP Morgan to enforce the Cashier's Checks under the circumstances is against the law and policy.

Accordingly, for the reasons stated above, JP Morgan's motion is GRANTED. This case is DISMISSED.

SO ORDERED.

        s/Avern Cohn  
        AVERN COHN  
        UNITED STATES DISTRICT JUDGE

Dated: October 6, 2008

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 6, 2008, by electronic and/or ordinary mail.

        s/Julie Owens  
        Case Manager, (313) 234-5160